Slip Op. 22-30

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - -x

UNITED STATES,                          :

                           Plaintiff, :

               v.          : Court No. 19-00125

KATANA RACING, INC., d/b/a            :
WHEEL & TIRE DISTRIBUTORS,
                                 :
                    Defendant.
                                 :

- - - - - - - - - - - - - - - - - - -x

<u>Opinion & Order</u>

[Defendant's motion to dismiss granted.]

Decided: March 28, 2022

    <u>Ashley Akers</u>, Trial Attorney, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Tara K. Hogan</u>, Assistant Director, for the plaintiff. Of Counsel <u>Karen Hiyama</u>, Senior Attorney, Office of the Assistant Chief Counsel, U.S. Customs and Border Protection, Detroit, MI.

    <u>John M. Peterson</u>, <u>Richard F. O'Neill</u>, and <u>Patrick B. Klein</u>, Neville Peterson LLP, New York, NY, for the defendant.

        AQUILINO, Senior Judge: This matter concerns a complaint for unpaid customs duties and fees owing to the United States Treasury allegedly "stem[ming] from violations of subsection 592(a) of the Tariff Act of 1930, 19 U.S.C. §1592(a), with respect to 386 entries of certain passenger vehicle and light truck tires('PVLT')

from [the People's Republic of] China into the United States from November 24, 2009 through August 7, 2012" via untrue declarations on entry forms filed with plaintiff's U.S. Customs and Border Protection ("CBP").  <u>See</u> Complaint ¶1.

Oddly, the complaint does not seek penalties <u>per se</u>, only recovery of $5,742,483.80 plus interest and costs, purportedly the responsibility of the nominal importer-of-record ("IOR") on the entry documents, a certain California-based reseller of PVLT and other motor vehicle wares.  <u>See</u> <u>id</u>. ¶3.

Summonsed herein, the defendant has interposed, prior to filing an answer, a motion to dismiss for lack of jurisdiction pursuant to USCIT Rule 12(b)(1) and 12(b)(6), explaining that it was the victim of a scheme of identity theft of its company name and denying it violated §1592(a). The complaint predicates timeliness[1] on its July 15, 2019 filing, the basis therefor being

---

[1]   <u>See</u> 19 U.S.C. §1621:

No suit or action to recover any duty under section 1592(d), 1593a(d) of this title, or any pecuniary penalty or forfeiture of property accruing under the customs laws shall be instituted unless such suit or action is commenced within five years after the time when the alleged offense was discovered, or in the case of forfeiture, within 2 years after the time when the involvement of the property in the alleged offense was

(continued...)

the latest of three consecutive waivers by the defendant of the statute of limitations ("SoL") up to and including July 19, 2019. See id. ¶ 4.  The defendant, however, revoked its last SoL waiver on June 26, 2019, and it contends that jurisdiction here is lacking, being time-barred either by 19 U.S.C. §1621 or by laches. See Def's Memorandum of Points and Authorities in Support of Motion to Dismiss ("Def's Br.") at 33 & Ex. P.

                                    I

        To defendant's knowledge,

    this case represents the first instance in the history of
    the current Section 592 law -- i.e., since the [Customs
    Procedural Reform and Simplification Act of 1978, Pub. L.
    No. 95-410, 92 Stat. 893] -- where the Government has

---

    [1]  (...continued)
    discovered, whichever was later; except that—

        (1) in the case of an alleged violation of
        section 1592 or 1593a of this title, no suit
        or action (including a suit or action for
        restoration of lawful duties under subsection
        (d) of such sections) may be instituted unless
        commenced within 5 years after the date of the
        alleged violation or, if such violation arises
        out of fraud, within 5 years after the date of
        discovery of fraud, and

        (2) the time of the absence from the United
        States of the person subject to the penalty or
        forfeiture, or of any concealment or absence
        of the property, shall not be reckoned within
        the 5-year period of limitation.

19 U.S.C. §1621.

> brought suit to collect withheld duties under Section 592(d) <u>without</u> <u>even</u> <u>attempting</u> to undertake the administrative proceedings necessary to establish that the predicate violation of Section 592(a) occurred. Accordingly, this action must be dismissed as time-barred, for failure to exhaust administrative remedies, and for failure to state a claim upon which relief can be granted.

Def's Br. at 20-21 (emphasis in original).

Defendant's counsel contend that dismissal is compelled because the plaintiff never found or articulated that their client violated §1592(a). A finding of such a violation is an obvious and necessary predicate to assessing responsibility, let alone penalties for withheld duties under that statute, they argue. Section 1592(b)(1) specifies the administrative process pursuant to which CBP is authorized to determine the existence of a §1592(a) violation. Counsel contend that CBP never followed or "exhausted" such procedure to determine any violation by the defendant, much less others actually responsible. Hence, when it became "clear" that no such administrative procedures were forthcoming, despite previous administrative promise(s) to the contrary, the defendant revoked its last SoL waiver.

On that basis, defendant's counsel argue for equitable tolling against CBP's arguments <u>vis</u>-<u>à</u>-<u>vis</u> defendant's revocation of its latest SoL, which would result in time-barring of this action and dismissal pursuant to Rule 12(b)(1) and/or 12(b)(6).

The issues of moment defendant's counsel distill to these:

1.   Whether CBP is required to conduct administrative procedures to "assert and determine" the existence of a 19 U.S.C. §1592(a) violation for which the defendant bears responsibility before commencing suit to recover "withheld duties" under 19 U.S.C. §1592(d);

2.   Whether the defendant could properly revoke its last SoL, prior to the commencement of this case, because that act implicates whether this action is timely commenced within the five-year SoL set out in §1621, eight to ten years having elapsed since the transactions at issue; and

(3) Whether laches applies in the alternative.

<u>See</u> Def's Reply.  Its initial brief also noted the following:

To the extent the parties rely on materials outside the pleadings, USCIT Rule 12(d) permits the Court, upon notice to the parties, to treat the motion as one for summary judgment. <u>See</u>[,] <u>e.g.</u>, <u>Easter v. United States</u>, 575 F.3d 1332, 1335-36 (Fed.Cir. 2009); <u>Cisco Sys. v. United States</u>, 804 F.Supp.2d 1326, 1336-1337 (Ct. Intl. Tr. 2011); <u>U.S. Ass'n of Imps. of Textiles & Apparel v. United States</u>, 366 F.Supp.2d 1280, at 1285-1286 (Ct. Intl. Tr. 2005).

Def's Br. at 4 n.4.

Plaintiff's general disagreement with the foregoing, and the court's consideration thereof, resulted in a cross-motion for summary judgment. <u>See</u> ECF No. 24 ("Pl's X-Mot").  In response, the defendant urges a decision on its motion to dismiss first, before turning to any decision on the merits. <u>E.g.</u>, ECF No. 37.

Consideration of the parties' positions persuades the court that it lacks jurisdiction over this matter.

II

Judicial consideration often involves interpretation of governing legal authorities, such as statutes and other questions of law.  E.g. Kent v. Principi, 389 F.3d 1380, 1384 (Fed.Cir. 2004) (interpretation of a statute or regulation is a question of law) (citation omitted); Yanko v. United States, 869 F.3d 1328, 1331 (Fed.Cir. 2017) (treating as a "pure legal issue of statutory interpretation" claim based on interpretation of statutory provision and related executive order).  Such legal interpretations are appropriately resolved under a Rule 12(b)(6) motion to dismiss. See Yanko at 1331 (citation omitted).

Rule 12(b)(6) dismissal is appropriate when a complaint's allegations do not entitle a remedy.  See United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327 (Fed.Cir. 2006) (citation omitted).  A motion thereunder "tests the legal sufficiency of a complaint," Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002), to determine if it presents a legally cognizable right of action, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted), or fails to "state a claim to relief that is

plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678
(2009) (quoting Twombly, 550 U.S. at 570).  The court accepts
well-pleaded factual allegations as true and draws all reasonable
inferences in favor of the claimant, Kellogg Brown & Root Servs.,
Inc. v. United States, 728 F.3d 1348, 1365 (Fed.Cir. 2013), with
the exception of legal conclusions among the allegations, Twombly,
550 U.S. at 555, nor need a court "accept as true allegations that
contradict matters properly subject to judicial notice or by
exhibit".  Secured Mail Sols., LLC v. Universal Wilde, Inc., 873
F.3d 905, 913 (Fed.Cir. 2017) (citation omitted).

A Rule 12(b)(6) motion is thus considered under the same
standard as a motion for judgment on the pleadings.  See SAP Am.,
Inc. v. InvestPic, LLC, 898 F.3d 1161, 1166 (Fed.Cir. 2018).  It
presents either a "facial" challenge to a pleading or to the
factual basis of the jurisdiction invoked.  See, e.g., Cedars-Sinai
Med. Ctr. v. Watkins, 11 F.3d 1573, 1583 (Fed.Cir. 1993).  Facial
challenges are based on the "sufficiency" of a pleading's
allegation(s), which are to be evaluated presuming the allegations
as true and as construed in their best light.  See id., citing
Scheuer v. Rhodes,  416 U.S. 232, 236 (1974).  If a challenge
denies or controverts material aspects of the complaint as pled,
then the movant is deemed to be challenging the factual basis for

subject matter jurisdiction, in which case only the uncontroverted factual allegations of the complaint are accepted as true for purposes of the motion.  See id., citing, inter alia, Gibbs v. Buck, 307 U.S. 66, 72 (1939); Kellogg Brown, 728 F.3d at 1365.

If jurisdiction is contested, consideration of extrinsic evidence outside the pleadings may be necessary to resolving that issue.  See Aerolineas Argentinas v. United States, 77 F.3d 1564, 1572 (Fed.Cir. 1996) ("[a] party may challenge the court's jurisdictional authority by denying or controverting necessary jurisdictional allegations"), citing, inter alia, KVOS, Inc. v. Associated Press, 299 U.S 269, 278 (1936).  When "close calls" are present, the foregoing may appear to obfuscate judgment on the pleadings and summary judgment, but if subject matter jurisdiction is lacking, then there can be no adjudication on the merits, see id.; consideration of matters outside the pleadings in deciding a 12(b)(6) motion brings the matter into the realm of summary judgment, and it is therefore appropriate to treat the motion as such.  See USCIT Rule 12(d); see, e.g., Forest Lab'ys, Inc. v. United States, 29 CIT 1401, 1402 (2005), aff'd, 476 F.3d 877 (Fed.Cir. 2007).

### III

According to defendant's papers, the United States imposed "safeguard" import duties on PVLT from the People's Republic of China ("PRC") pursuant to 19 U.S.C. §2451(f) (omitted since Dec. 11, 2013). Proclamation No. 8414, 3 C.F.R. §8414 (2009). They were imposed in addition to the 3.4% or 4% <u>ad</u> <u>valorem</u> tariffs on PVLT[2] and were in effect for three years, at declining rates of 35%, 30%, and 25%, <u>ad</u> <u>valorem</u>, respectively. The safeguard duties were set to expire in September 2012. <u>See</u> <u>id</u>.

The announcement of those duties prompted the defendant to curtail supply from the PRC. PRC producers responded by persuading the defendant to purchase tires at "Delivered Duty Paid" ("DDP") prices. <u>See</u>, <u>e.g.</u>, International Chamber of Commerce, <u>Incoterms 2010: ICC Rules for the Use of Domestic and International</u> <u>Trade Items</u> (2010) ("Incoterms") ("[t]he Incoterms rules explain a set of three-letter trade terms reflecting business-to-business practice in contracts for the sale of goods").

A DDP agreement obligates <u>sellers</u> with the responsibility for all necessary legal compliance relevant to importing the goods,

---

[2]   <u>I.e.</u>, subheadings 4011.10.10, 4011.10.50, 4011.20.10, and 4011.20.50 of the Harmonized Tariff Schedule of the United States ("HTSUS").

for example payment of import duties and merchandise processing fees.  <u>See</u> note 4, <u>infra</u>.  After "satisfactory" negotiations along those lines, the defendant agreed to continue to purchase PVLT from the PRC companies involved on a DDP basis.

This, apparently, is where trouble began.  The defendant was at that time also induced to agree to a power of attorney ("POA")[3] that its suppliers, as it later turned out, had falsely represented was necessary to allow them to move the imported tires from the Customs area at the Port of Long Beach to defendant's facility in Southern California, as more wholly described below. <u>See</u> Def's Br., Ex. B (CBP Audit Report dated March 22, 2013). Instead, the sellers, or certain unknown and unscrupulous individuals taking advantage of them, used defendant's identifying information from the POA, including its importer number, to falsely declare the defendant as the importer of record on the entry documents concerned.

---

[3]  <u>See</u> 19 C.F.R. §141.32 (2009): "Customs Form 5291 may be used for giving power of attorney to transact Customs business. If a Customs power of attorney is not on a Customs Form 5291, it shall be either a general power of attorney with unlimited authority or a limited power of attorney as explicit in its terms and executed in the same manner as a Customs Form 5291."

A

The defendant claims it had no knowledge of such falsified entries, averring that for the next three years it received PVLT at its California facility on a DDP basis and tendered payment to its vendors at the negotiated prices.[4] In mid-2012, CBP's Regulatory Audit Division at the Port of Seattle, Washington, contacted the defendant in order to conduct a "Quick Response Audit"[5] of some 61 customs entries of PVLT on which the defendant had been listed as the IOR.

The defendant claims it found none of the alleged entries among its records.  Its records, audited by CBP, reflect that it

---

[4] As the buyer in a DDP transaction, the defendant here disclaims responsibility for customs obligations such as clearance or payment of duty to CBP.  According to Incoterms, "'Delivered Duty Paid' means that the seller delivers the goods when the goods are placed at the disposal of the buyer, cleared for import on the arriving means of transport ready for unloading at the named place of destination. The seller bears all the costs and risks involved in bringing the goods to the place of destination and has an obligation to clear the goods not only for export but also for import, to pay any duty for both export and import and to carry out all customs formalities."  See https://iccwbo.org/resources-for -business/incoterms-rules/incoterms-rules-2010) (emphasis added) (last accessed this date).

[5] The defendant describes Quick Response Audits as single-issue audits with a narrow focus and designed to address a particular limited objective within a reasonably short period of time. The authority for auditors to examine records and conduct audits is contained in 19 U.S.C. §§ 1508 and 1509.

was billed on a DDP basis by vendors <u>with whom it actually did</u>
<u>business</u> and made payments to those vendors on that basis.  The
records also showed that the defendant never advanced or paid any
separate or segregated monies for duties in respect of the imported
PVLT, never corresponded with any customs brokers regarding those
tires, and never received bills for customs duties or bills for
freight forwarding or customs brokerage services.

The defendant therefore deduced the theory that its
identity must have been "misappropriated", so on July 23, 2012 it
"protectively" filed such theory in writing to CBP via a voluntary
prior disclosure at the Port of Los Angeles/Long Beach pursuant to
19 U.S.C. §1592(c)(4).  The filing stated that erroneous entries
had been made in its name and without its knowledge, authorization,
or consent.  <u>See</u> Def's Br., Ex. A (Prior Disclosure of July 23,
2012[6]).

The Quick Response Audit concerned certain selected
entries in 2012 and 2013.  The defendant claims it gave its full
cooperation during the audit, and it also obtained other Importer

---

[6]   The filing stated at the outset: "Katana Racing has
knowingly acted as the importer of record of tires subject to the
Safeguard duties.  To Katana Racing's knowledge, it has deposited
the appropriate Safeguard duties for all entries where it was aware
that it acted as the importer of record."

Trade Activity ("ITRAC"[7]) data from CBP that confirmed that its identity had been "misappropriated" for the purpose of making not only the 61 selected entries with which the Quick Response Audit had been concerned but also hundreds of other entries of PVLT from the PRC as well.  According to the defendant, they were filed by dozens of separate customs brokers, all of whom it claims were and are complete strangers to it.

Beginning February 3, 2013, defendant's counsel contacted the dozens of brokers identified in the ITRAC report who had filed entries in its name and began collecting copies of the entry summaries improperly filed.  This information confirmed to the defendant that it had been the victim of a pervasive scheme of what it styles as "identity theft", as PRC vendors had engaged U.S. customs brokers to file entries in its name, without its knowledge or permission.  It claims that it also cooperated fully with the CBP audit, providing agency auditors with copies of all commercial invoices and proofs of payment for all DDP entries in question.

---

[7]  "ITRAC" refers to company-specific import data placed in a database and provided on CD-Rom to the requestor for a processing fee.  See https://www.cbp.gov/trade/itrac-requests (last accessed this date).

On April 5, 2013, CBP issued a report finding that duties, taxes and fees had been underpaid on the 61 entries in the aggregate amount of $792,053.69.  See id., Ex. B (CBP Audit Report of April 5, 2013).  The report included notes on the cooperation of Katana and its General Manager, Mr. Joe Garcia, thanking for that cooperation and recognizing that the defendant "stated that it did not direct the importation of these goods." Id., Ex. B, at 4; see also id. ("[u]nbeknownst to [defendant], it appears that the [PRC] suppliers, working with Customs brokers in Los Angeles, made Katana the importer of record . . ." et cetera).

CBP's auditors noted that these facts, combined with defendant's genuine lack of access to relevant bills of lading or shipping contracts, had frustrated agency effort to make an adjustment to its calculation of revenue loss such that it could reflect non-dutiable international transportation expenses that were included in the DDP prices stated in the operable invoices. According to the defendant, the auditors had based their calculation of dutiable values on the DDP prices paid by it.

On August 31 and September 1, 2013, the defendant provided additional information to CBP in an effort to assist its prior disclosure.  See id., Ex. C (Def's Letter of August 31,

2013), Ex. D (Def's Letter of September 1, 2013).  In addition, on May 16, 2014, the defendant executed a two-year waiver of the SoL period in response to CBP's request therefor.  See id., Ex. E (Def's First SoL Waiver of May 16, 2014); see also 19 U.S.C. §1621.

### B

After conducting the foregoing, and with the ITRAC information provided to it by the defendant, CBP expanded the audit to encompass a total of 386 entries made while the safeguard duties were in place (i.e., September 26, 2009 through September 25, 2012, including the 61 previously described).  The defendant claims that it continued to fully cooperate in this effort, retrieving entries from the various customs brokers that had unlawfully filed entries in its name, and comparing the information contained therein to the DDP invoices which the defendant had received from its vendors.

On June 22, 2015, CBP's Fines, Penalties and Forfeitures Office in Long Beach, CA, issued a letter to the defendant, indicating that CBP had calculated a loss of revenue totaling $10,451,452.75, and requesting payment of that amount to "perfect" the 2012 voluntary prior disclosure.  See Def's Br., Ex. F.[8]

---

[8]  CBP's lengthy regulation on voluntary disclosure, 19 C.F.R. §162.74(c), provides as follows (emphasis added):

(continued...)

---

[8]   (...continued)

**(c)   Tender of actual loss of duties, taxes and fees or actual loss of revenue. <u>A person who discloses the circumstances of the violation shall tender any actual loss of duties, taxes and fees or actual loss of revenue</u>. The disclosing party may choose to make the tender either at the time of the claimed prior disclosure, or within 30 days after CBP notifies the person in writing of CBP calculation of the actual loss of duties, taxes and fees or actual loss of revenue. The Fines, Penalties, and Forfeitures Officer may extend the 30-day period if there is good cause to do so. The disclosing party may request that the basis for determining CBP asserted actual loss of duties, taxes or fees be reviewed by Headquarters, provided that the actual loss of duties, taxes or fees determined by CBP exceeds $100,000 and is deposited with CBP, more than 1 year remains under the statute of limitations involving the shipments covered by the claimed disclosure, and the disclosing party has complied with all other prior disclosure regulatory provisions. A grant of review is within the discretion of CBP Headquarters in consultation with the appropriate field office, and such Headquarters review shall be limited to determining issues of correct tariff classification, correct rate of duty, elements of dutiable value, and correct application of any special rules (GSP, CBI, HTS 9802, etc.). The concerned Fines, Penalties, and Forfeitures Officer shall forward appropriate review requests to the Chief, Penalties Branch, Office of International Trade.  After Headquarters renders its decision, the concerned Fines, Penalties, and Forfeitures Officer will be notified and the concerned Center director will recalculate the loss, if necessary, and notify the disclosing party of any actual loss of duties, taxes or fees increases.  Any increases must be deposited within 30 days, unless the local CBP office authorizes a longer period.  Any reductions of the CBP calculated actual loss of duties, or and fees shall be refunded to the disclosing party.  Such Headquarters review decisions are <u>final</u>. <u>Further, disclosing parties requesting and obtaining such a review waive their right to contest</u>**

(continued...)

The defendant underscores that CBP's letter does not constitute a pre-penalty or penalty notice under 19 U.S.C. §1592. It responded to the letter by noting its inability to pay the amount demanded and questioning the amount stated in the letter on the basis that CBP's calculations had not adjusted the DDP prices to reflect non-dutiable elements such as customs duties or international freight. <u>See</u> <u>id</u>., Ex. G (Def's Letter of July 23, 2015). It also provided CBP with a second SoL waiver to allow additional time to "rectify" the problem through an orderly administrative process. <u>See</u> <u>id</u>., Ex. H.

On February 12, 2016, CBP issued a revised duty demand to the defendant, requesting payment of a revenue loss of $5,742,483.80. <u>See</u> <u>id</u>., Ex. I.

C

On February 24, 2016, the defendant wrote to CBP requesting a meeting. <u>See</u> Def's Br., Ex. J. On March 21, 2016, defendant's counsel, and the President, General Manager and

---

[8]   (...continued)
<u>either administratively</u> <u>*or judicially*</u> the actual loss of duties, taxes and fees or actual loss of revenue finally calculated by CBP under this procedure. <u>Failure to tender the actual loss of duties, taxes and fees or actual loss of revenue finally calculated by CBP shall result in denial of the prior disclosure</u>.

Controller of the defendant in Long Beach, California, met with the Assistant CBP Port Director Jorgé Garcia.

At the meeting, the defendant made a brief presentation, during which it reiterated its inability to pay the amounts demanded, stated it did not believe it was liable for same, asked CBP to allow it to retain its "prior disclosure" status, requested issuance of a "formal" pre-penalty notice, and claimed that the latter was "required" by 19 U.S.C. §1592(b) so that the administrative process could commence and the company could provide a thorough narrative of events to demonstrate why it had not acted in any manner that violated the proscriptions of §1592(a).

Mr. Garcia indicated apparent agreement as to defendant's view of the overall process, which the defendant documented and left the meeting anticipating receipt of a notice of the specifics of the alleged §1592(a) violation so that the company could make its case.  See id., Ex. K.

On October 25, 2016, upon request, the defendant furnished CBP with its third waiver of the SoL, through July 15, 2019.  See id., Ex. L.  The waiver specifically states that the defendant agreed to the extended limitations period

> in order that Katana might obtain the benefits of the
> orderly continuation and conclusion of any administrative
> proceedings <u>currently being conducted or contemplated by
> CBP, so that Katana could enjoy the benefit of orderly
> administrative proceedings</u> in which CBP is reviewing
> entries of tires by Katana which might be subject to
> safeguard duties formerly imposed on entries of certain
> passenger car and light truck tires from China.

<u>Id</u>. (emphasis added).

D

Nothing of note occurred thereafter until May 2018, nearly a year and a half later, when CBP attorney Karen Hiyama indicated by *e-mail* that she had "inherited" defendant's case file that had been transferred from the Port of Long Beach to her office at CBP's Center of Excellence and Expertise ("CEE") for Automotive and Aviation products, in Detroit, MI.  <u>See</u> Def's Br., Ex. M *(e-mail* correspondence with Ms. Hiyama on May 24, 2018, June 14, 2018, August 22, 2018, March 28, 2019).  The defendant believes that Ms. Hiyama had not received the entire case file and was not aware of all that had transpired between it and CBP before.  Defendant's counsel therefore, in response to Ms. Hiyama's inquiry, provided her with information regarding defendant's meeting with Assistant Port Director Garcia.  <u>Cf</u>. <u>id</u>.

Defendant's counsel also aver that, on or about March 28, 2019 (nine months later), Ms. Hiyama stated to them that this

matter had come to the "top of my docket after quite a long
hiatus." Id.  She noted Katana's statement of inability to pay the
$5.7 million, indicated that substantiating information concerning
the company's inability to pay should be submitted, and "advised"
that "there is a pathway to settlement by treating any offer by
[the defendant] as an offer in compromise without the issuance of
a duty demand." Id.

The defendant emphasizes that at that point it was still
awaiting the initiation of administrative procedures "required
under Section 592(b), which had been promised long before by
Assistant Port Director Garcia." Def's Br. at 7; see also id., Ex.
L (Def's Third SoL Waiver of October 25, 2016) ("This waiver is
made knowingly and voluntarily by Katana Racing, Inc., in order
that Katana might obtain the benefits of the orderly continuation
and conclusion of any administrative proceeding currently being
conducted or contemplated by CBP, in which CBP is reviewing entries
of tires by Katana which might be subject to safeguard duties
formerly imposed on entries of certain passenger car and light
truck tires from China"); Def's Reply at Appx. V (e-mail exchange
between the parties dated May 3-6, 2019 with attachment of the
third SoL waiver).  Further, "Ms. Hiyama had previously been fully

apprised of Mr. Garcia's awareness and representations in this regard."  Def's Br. at 8.

Subsequently, on May 31, 2019, Ms. Hiyama e-mailed defendant's counsel that her office would be preparing a §1592(d) duty demand.  <u>See</u> <u>id</u>., Ex. N.  In it, she stated "I'm unfamiliar with the reason or reasons why the government would not also seek a penalty <u>given the 1592(a) violation that underlies the duty demand</u>."  <u>Id</u>. (emphasis added).[9]  Several weeks later, on June 20, 2019 -- with just 25 days remaining in the waived limitations period for events which began years before -- CBP finally issued a summary demand for payment of duties pursuant to 19 U.S.C. §1592(d).[10]  The notice, as defendant's counsel emphasize, contained none of the information normally specified in a "Section 592(b)

---

[9]  **Ms. Hiyama's revelation speaks volumes regarding the government's motivation for this action.  The Constitution <u>protects</u> citizens from a government that would keep them in limbo for years, attempting as-yet-to-be-determined reasons for keeping them in such limbo, for as-yet-to-be-determined "offenses," before reaching for that lowest hanging statutory fruit of "unpaid duties".**

[10]  **That subsection provides as follows:**

**Notwithstanding section 1514 of this title, if the United States has been deprived of lawful duties, taxes, or fees as a result of a violation of subsection (a), the Customs Service shall require that such lawful duties, taxes, and fees be restored, whether or not a monetary penalty is assessed.**

notice and completely omitted any allegations of any violation of Section 592(a)" attributable to the <u>defendant</u>.  <u>Id</u>*.,* referencing Ex. O (CBP Section 592(d) Demand of June 20, 2019).  Specifically, the notice stated in pertinent part:

> Demand is hereby made of your client, Katana Racing, Inc., pursuant to Title 19, United States Code, Section 1592(d) for payment of $5,742,483.80, representing duties deprived the United States due to violation of Title 19, United States Code, Section 1592(a). The actions, which constitute the violation, are specified in Exhibit A, enclosed.

* * *

Exhibit A

* * *

> 4. FACTS ESTABLISHING THE VIOLATION:
>
> On July 9, 2009, the U.S. International Trade Commission (USITC) issued a report stating that certain passenger vehicle and light truck (PVLT) tires from China were being imported into the United States in such increased quantities or under such conditions as to cause or threaten to cause market disruption to the domestic producers. To provide import relief with respect to the tires, the President issued Proclamation 8414, which imposed additional duties on imports of PVLT tires from China for three years, effective September 26, 2009 to September 26, 2012.
>
> The subject 386 entries were submitted misclassified and undervalued, and also omitted safeguard duties on PVLTs from China as required by Presidential Proclamation 8414.
>
> On July 23, 2012, Katana submitted a Prior Disclosure, (PD), to the Port of Los Angeles/Long Beach related to potential value and classification errors for Chinese tire imports subject to safeguard duties pursuant to

Presidential Proclamation 8414. <u>Katana admitted to $5,393,570.88 in duties and fees owed to CBP</u>; however, Katana did not tender payment, claiming an inability to pay. An audit was conducted by CBP to determine whether the loss of revenue, (LOR), identified by Katana related to the PD was accurate and complete, and to determine any additional LOR that may be due to CBP. Based on the review by CBP, the LOR identified by Katana was inaccurate; <u>the actual LOR was determined to be $5,742,483.80</u>. A request was issued for the actual LOR of $5,742,483.80 but the payment was not tendered.

Def's Br., Ex. O (emphasis added).

Responding, the defendant filed a detailed submission and requested an in-person conference. <u>See</u> Def's Br., Ex. P (Def's Letter of June 26, 2019) ("Under the Customs Regulations, Katana is permitted the right to make an oral presentation, as well as a written presentation, in response to this demand. We hereby request an oral conference. ..."[11]). It also revoked its most recent waiver of the SoL, since at that point it now seemed "clear" to the defendant that the waiver had been procured by "false pretenses." Def's Br. at 8 (citing Ex. L, Def's Third SoL Waiver

---

[11] "Moreover, Katana did not benefit from the falsehoods contained in the entries. The company had agreed to pay DDP prices for Chinese tires, and paid such prices. By doing so, Katana believed its sellers had elected to bear the burden of the safeguard duties, possibly trimming their profit margins in order to continue making sales -- a common business practice. It appears the Chinese sellers elected to enhance their profits by short-paying Customs." Def's Br., Ex. P (Def's Letter of June 26, 2019), ECF No. 12-3 at page 211 of 426.

of October 25, 2016).  Elaborating here, the defendant explains that despite having taken more than three years to act since its conference with CBP's Assistant Port Director, CBP by that point had completely failed to initiate the "promised" administrative process.  See id. at 7 ("CBP never initiated the proceedings required under Section 592(b)").

Ms. Hiyama responded to defendant's counsel by *e-mail* on July 1, 2019.  The defendant avers that her message "falsely" claimed that "you have been representing since 2016 that your client would work toward a payment plan to pay the loss of revenue."  Cf. id., Ex. P (Def's Letter of June 26, 2019).  In fact, the defendant argues, in its last substantive communication with CBP the company disclaimed liability and requested that it

> be given an opportunity to present defenses grounded in (1) identity theft and misappropriation by various Customs brokers and (2) whether any conduct by Katana constituted a violation of 19 U.S.C. §1592(a), to wit, entry or attempted entry or introduction of goods into the United States by means of false and material statements or practices, or by means of material omissions. As we discussed, findings by two teams of Customs auditors have supported Katana's claims that its identity was stolen or misappropriated, and that the subject entries were made without Katana's knowledge or authorization.

See id., Ex. K (Letter of March 22, 2016), Ex. Q (*e-mail* of Ms. Hiyama, July 1, 2019).

The defendant highlights Ms. Hiyama's indication that it had been her "goal" to "settle this matter without issuance of a formal duty demand" (and without providing the notice and procedure "required" by Section 592(b), according to the defendant), and it further points out that she overemphasized the evidence of defendant's financial condition, provided at <u>her</u> request[12], upon her assertion that counsel had "made it appear as though you and your client were negotiating in good faith." <u>See id</u>.

The defendant avers that no such negotiation was ever initiated, nor were any offers ever made, and it notes Ms. Hiyama also made the "remarkable" assertion that "[t]he recipient of a duty demand, in contrast to a prepenalty notice, has no right to an administrative process."[13] <u>See id</u>. The defendant responded on July 2, 2019, reiterating its claim of innocence and noting its "statutory entitlement to the Section 592(b) procedures which CBP was refusing to give." <u>See id</u>., Ex. R.

---

[12] Defendant's counsel explain that the financial information was provided in order to corroborate its March 22, 2016 representation to Mr. Garcia in anticipation of the "promised " administrative proceedings under Section 592. <u>See</u> Def's Br., Ex. K (Def's Letter of March 22, 2016).

[13] The defendant contends this assertion calls into question why CBP had thrice requested from Katana waivers of the statute of limitations, each time predicated on the notion that it would allow for an orderly administrative process. <u>See</u> Def's Br., Exs. E, H, L.

CBP then e-mailed counsel on July 8, 2019, attaching a response to that letter.  See Def's Br., Ex. S (*E-mail* of CBP Paralegal), Ex. T (CBP Letter of July 8, 2019).  CBP summarily denied defendant's request for a conference and reiterated the agency's demand for payment of "withheld duties" on entries long ago liquidated and final.[14]  See id.  CBP thereafter filed its Summons and Complaint in this action seeking to collect "withheld" duties under §1592(d).

Regarding the complaint, the defendant notes that CBP again failed to include any allegation of an underlying violation of §1592(a) by it or any CBP finding of such a violation.  In particular, the complaint alleges, for example, as follows:

> 11. The 386 entries were submitted to CBP with invoices that listed prices lower than what Katana actually paid its Chinese vendors for the PVLT tires.
>
> 12. For example, one commercial invoice supplied by a customs broker to CBP during the entry process valued the covered merchandise at $21,220.00.  The Chinese tire vendor paid duties of $6,253.84 assessed against the value of the merchandise stated in the invoice supplied at entry, including $5,305.00 assessed as safeguard duties.  Another commercial invoice, supplied by Katana to CBP during a regulatory audit, valued the same

_____

[14] The defendant also contends this correspondence obliterates the assertion in paragraph 24 of plaintiff's complaint that "after it submitted its tax returns on May 21, 2019, [it] stopped communicating with CBP."

merchandise at $136,350.00. <u>Using the information
reflected in the latter invoice, which is the amount
actually paid by Katana to the Chinese tire vendor</u>, the
safeguard duties alone should have amounted to
$34,087.50.

Emphasis added.


                                 IV

        As framed by defendant's instant motion, the question

here is whether plaintiff's complaint fails to state a claim for

which relief can be granted, which implicates the circumstances

that would permit a company to revoke its waiver of the relevant

statute of limitations ("SoL") pertaining to a customs duty matter.

Plaintiff's unpaid duty complaint is not inconsistent with

defendant's "identity theft" averment and its disclaimed

responsibility for such duties, but the papers and extrinsic

evidence persuade that the defendant was at least defalcated with

respect to the imported tires it actually received through the

misuse of its good name[15]. There is insufficient evidence to deduce

---

        [15] Defalcation is "financial wrongdoing involving a breach
of trust[.]" <u>Black's Law Dictionary</u> (11th ed. 2019). Arguably, in
the context of an importer DDP transaction, the risk of defalcation
or embezzlement would seem to be obvious. <u>Cf</u>. 19 U.S.C. §1484
("importer" is subject to reasonable care standard when making
entries, <u>etc</u>.). However , the mechanism by which "identity theft"
of the defendant's good name could actually occur for import
transactions it did <u>not</u> receive, if any, is unclear, given the
steps that must be undertaken to release imported goods to the
                                                    (continued...)

whether the defendant actually received all the imports covered by the 386 entries, but after considering its efforts in attempting to work with CBP to resolve matters, it may at least be concluded that defendant's revocation of its last SoL was not unreasonable, and not mere "litigation strategy."

The general proscription against inaccuracies in customs duty declarations is found in 19 U.S.C. §1592(a):

(a) Prohibition

(1) General rule.  Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty, tax, or fee thereby, no person, by fraud, gross negligence, or negligence—

(A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of—

(i) any document or electronically transmitted data or information, written or oral statement, or act which is material and false, or

(ii) any omission which is material, or

---

[15]  (...continued)
importer.  See, e.g., id.; 19 U.S.C. §1499 (required examination of certain imports).  Be that as it may, it is also notable that after the events in question, in late 2019 CBP proposed via Federal Register notice to amend its regulations in order "to require customs brokers to collect certain information from importers to enable the customs brokers to verify the identity of importers, including nonresident importers." Customs Broker Verification of an Importer's Identity,  84 Fed.Reg. 40302 (CBP Aug. 14, 2019).

> (B) may aid or abet any other person to violate subparagraph (A).
>
> (2) Exception.  Clerical errors or mistakes of fact are not violations of paragraph (1) unless they are part of a pattern of negligent conduct. The mere nonintentional repetition by an electronic system of an initial clerical error does not constitute a pattern of negligent conduct.

This general rule is followed by 19 U.S.C. §1592(b), which provides that, "[i]f the Customs Service has reasonable cause to believe that there has been a violation of subsection (a) <u>and determines that further proceedings are warranted</u>, it shall issue <u>to the person concerned</u> a written notice[16] of its intention to issue a claim for a monetary penalty."  19 U.S.C. §1592(b)(1)(A) (emphasis added).

Such person is not defined, but it is plain that in an administrative decision to pursue "the person concerned" for a

---

[16] A "violation of subsection (a)" notice "<u>shall</u>": (i) describe the merchandise; (ii) set forth the details of the entry or introduction, the attempted entry or introduction, or the aiding or procuring of the entry or introduction; (iii) <u>specify all laws and regulations allegedly violated</u>; (iv) <u>disclose all the material facts which establish the alleged violation</u>; (v) state whether the alleged violation occurred as a result of fraud, gross negligence, or negligence; (vi) state the estimated loss of lawful duties, taxes, and fees, if any, and, taking into account all circumstances, the amount of the proposed monetary penalty; and (vii) inform such person that he shall have a reasonable opportunity to make representations, both oral and written, as to why a claim for a monetary penalty should not be issued in the amount stated. 19 U.S.C. §1592(b)(1)(A) (emphasis added).

violation of subsection (a) -- whether the decision involves proceedings before the agency or involves it pursuing that person directly in court -- the question is, in either event, a decision on a "further proceeding" by the agency that comes within the ambit of subsection (b)'s requirement of proper written notice, regardless of whether it decides to pursue a monetary penalty or not.

The statute's subsection (c) then describes, <u>inter</u> <u>alia</u>, the "maximum penalties" for fraud, gross negligence, and negligence, and thereafter subsection (d) provides as follows:

> Notwithstanding section 1514 of this title, if the United States has been deprived of lawful duties, taxes, or fees as a result of a violation of subsection (a), the Customs Service shall require that such lawful duties, taxes, and fees be restored, whether or not a monetary penalty is assessed.[17]

An aspect of the overall problem here is the extent to which "administrative procedures" by CBP were "required" to "get to the bottom" of the defendant's "identity theft" issue as a precondition of any duty demand -- and, arguably, as promised. The

---

[17] The cross-reference to section 1514 in this subsection (d) of 19 U.S.C. §1592 concerns the finality of administrative protests of decisions of CBP as to appraisement, classification, duty drawback, <u>et</u> <u>cetera</u>, which, generally speaking, are "final" unless challenged in this Court of International Trade within 180 days. <u>See</u> 19 U.S.C. §1514(a); 28 U.S.C. §2636(a).

"faith" (good or otherwise) of CBP's dealings with the defendant has not been established as a matter of fact at this point in this action, but the starting point for any such inquiry must be the presumption of administrative regularity, the burden being on the defendant to prove otherwise.  But again, whatever the merits of plaintiff's position herein[18], as a matter of procedural posture the paper trail makes plain that the plaintiff did not properly exhaust the administrative procedures that it had obliged itself to undertake.  See infra.

Early in this unpaid-duties matter, both CBP and the defendant invoked the maxim that administrative requirements may be relaxed when circumstances warrant[19], as evident among the documents

---

[18] CBP's best practices compliance measures involve taking all reasonable steps to safeguard the legitimate use of one's business name in commerce, a safeguard that should be obvious even outside the realm of customs law.  See, e.g., "Protecting Personal Information, A Guide for Business" at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (sic) (last examined this date).  Thus, on the one hand, defendant's position might appear to depend upon the parameters of the power of attorney it intended to convey, see supra, note 3, which is not evident among the papers presented, but, on the other hand, the plaintiff may well have sued the wrong party here.

[19] "[I]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it." American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 539 (1970) (citation
(continued...)

indicating the Assistant Port Director's intonations to the defendant at their meetings, which are not controverted herein, during which was expressed some form of assent or agreement as to defendant's predicament and a desire between both sides to continue defendant's "voluntary disclosure" status and pursue further administrative process in furtherance of the record. Such indications are part of this action, all of which plaintiff's "inheriting" caseworker seems to have ignored or downplayed.

The giving of proper monetary demand notice, and the reasons therefor, is a necessary predicate to pursuing any claim under 28 U.S.C. §1582. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").[20] At a minimum, any such notice must explain not

---

[19] (...continued)
omitted). For example: foregoing the deposit of sums that CBP would otherwise demand as a condition of even considering an administrative appeal.

[20] But see Den ex dem. Murray v. Hoboken Land & Imp. Co., 59 U.S. 272 (18 How. 272) (1856) (the distress collection of debts due the crown, established by common law, had been the exception to the
(continued...)

only what the violation of subsection (a) actually <u>is</u> but also the accused's <u>relationship to it</u>.   See <u>Philipp Bros. Chemicals v. United States</u>, 222 F.Supp. 489, 491 (Cust. Ct. 1963) (collector's notice of appraisement to importer on form reciting that it was being "given for the reason checked below" without any "checked" reason to inform noticee which reason was applicable to his importation did not give legal notice but only a blanket notice, and any liquidation based upon such notice was invalid).

In this matter, the "Exhibit A" attached to the monetary demand notice sent to the defendant does identify that a violation did occur, couched in the form of the second paragraph ("The subject 386 entries were submitted misclassified and undervalued, and also omitted safeguard duties on PVLTs from China as required by Presidential Proclamation 8414.").

What is missing from the written demand, however, is a clear statement of how that subsection (a) violation is attributable <u>to the defendant</u>.   The demand letter refers to defendant's "admi[ssion] to $5,393,570.88 in duties and fees owed

_____

[20]   (...continued)
rule in England of notice, was at the time of adoption of the U.S. Constitution long usage in the United States, and was thus sustainable).

to CBP", but whether the defendant had the capacity to "admit" that CBP was owed that amount in duties and fees, the statement gives no indication of what defendant's <u>actual</u> (alleged) responsibility for those duties and fees <u>is</u>, given CBP's awareness that those duties should have been paid by the Chinese sellers of the PVLT via their freight forwarders or brokers due to defendant's DPP agreement with them, and that the defendant had apparently been defalcated.

The Federal Circuit has held that the finding of §1592 culpability must originate with CBP in administrative proceedings, and may not be posited by the Department of Justice in litigation. <u>United States v. Nitek Electronics, Inc.</u>, 806 F.3d 1376, 1380-81 (Fed.Cir. 2015) ("[T]he legislative history nowhere suggests that the Department of Justice should determine the level of culpability. It leaves this determination in the hands of Customs".). Further, whether to waive exhaustion of administrative proceedings lies in the sound discretion of the court. <u>Id</u>. at 1381-82, citing <u>United States v. Priority Prods., Inc.</u>, 793 F.2d 296, 300 (Fed.Cir. 1986). Here, merely stating that the defendant is named on the entry papers as the "importer of record" is insufficient. Waiver of the requirement of exhaustion is not merited here.

The motion at bar satisfies this court that defendant's interpretation of its DDP offer from its Chinese counterparts was sincere.[21] The defendant responded accordingly, and that consideration leads to the present. Jurisdiction, or lack thereof, emanates from such facts. Here, those include defendant's attempt at voluntary disclosure, its evolving defense vis-à-vis "responsibility" for the unpaid safeguard duties, and, finally, its steadfast request to CBP that the latter provide, in writing, an explanation of what it, the defendant, is being accused -- i.e., the specific §1592(a) violation.

### A.   Attempted "Voluntary Disclosure"

Defendant's counsel initially and apparently assumed that their client might bear responsibility for some (but not all) of the erroneous entry declarations that had been perpetrated by others, and solidified the conundrum by filing with CBP a voluntary disclosure pursuant to 19 U.S.C. §1592(c)(4) and 19 C.F.R. §162.74. As far as responsibility for the unreported safeguard duties, the assumption that voluntary disclosure was the right vehicle for addressing that problem was incorrect, as it is not a suitable mechanism to report "identity theft" on entry. The regulation is

---

[21] Trust requires a leap of faith. See, e.g., Jack Schaefer, Shane (Houghton Mifflin, 1949).

framed in such a way that the person who makes a voluntary disclosure is to be inferred responsible (i.e., "the person concerned") for "the circumstances of a violation" as defined in §162.74(b)[22]. The defendant's initial action thus defies logic, at least with hindsight here, most likely because the ramifications of its conundrum went unappreciated by it at the time. Among other conditions, the voluntary disclosure regulation requires payment of the sums CBP demands before it will even consider the circumstances of the voluntary disclosure -- an onerous requirement of one ostensibly innocent of such wrongdoing. Rather, fraudulent entry (via, e.g., "identity theft") is properly reported under such statutes as 19 U.S.C. §1619 (award of compensation to informers) or pursuant to the False Claims Act, 31 U.S.C. §3729 et seq., for example.

---

[22] 19 C.F.R. §162.74(b) provides, inter alia, that the term "discloses the circumstances of a violation" means the act of providing to Customs a statement, orally or in writing, that: (1) identifies the class or kind of merchandise involved in the violation; (2) identifies the disclosed importation or drawback claim by some means (e.g. entry number); (3) specifies the material false statements, omissions or acts, including an explanation as to how and when they occurred; and (4) sets forth, to the best of the disclosing party's knowledge, the true and accurate information or data that should have been provided in the entry or drawback claim documents, and states that the disclosing party will provide any information or data unknown at the time of disclosure within 30 days of the initial disclosure date.

For its part, in filing this action, it also becomes plain that the government is relying entirely on defendant's attempt at voluntary disclosure as an admission against interest and as the only basis upon which to hold the defendant responsible for making the United States Treasury whole for unpaid duties. See, e.g., Plaintiff's Cross Motion for Summary Judgment at 3 ("Katana admitted irregularities" etc.).  That is, plaintiff's complaint attempts to hold the defendant "responsible" based entirely on Katana's attempted prior disclosure and its seemingly-acquiescent statements during the informal Quick Response audit(s).

Obviously, counsel of record on both sides "inherited" this matter.  Both might also be considered to have been blind-sided by the novelty of the scam to which the defendant was subjected.  But this court interprets defendant's initial voluntary disclosure response (upon discovery of its "stolen" identity) in the light that it deserves and notes that the plaintiff did not. The court fully understands plaintiff's position, if not its motivation, and it is bound by the allegations of its complaint. All things considered, the plaintiff does not deserve judgment on this complaint.  The papers and extrinsic evidence indicate that the plaintiff chose to exert the entirety of its federal power to "go after" the named defendant -- not only as to certain "admitted"

(and for purposes of this motion irrelevant) "irregularities" but to demand as well all the "unpaid duties" from the defendant alone, rather than exert <u>any</u> effort (none is apparent among the papers) to detect and pursue the person(s) <u>actually</u> <u>responsible</u> for those unpaid duties.

Defendant's counsel elaborate that the purpose of the voluntary disclosure filing was to make CBP at least "<u>aware</u> of the alleged violations by means of a 19 U.S.C. §1592(c)(4) prior disclosure filed in 2012." Def's Mot. for a Status Conference at 2 , ECF 27 (March 16, 2020) (emphasis added). And, once again, the papers do make clear that CBP expressed awareness that the defendant had been defalcated. <u>See</u>, <u>e</u>.<u>g</u>., <u>id</u>. at 6, quoting Def's App. at 212 (". . . despite the fact that [Katana] was improperly named as importer of record") and at 230 (the "386 entries involved in the instant demand [that] had been made in the company's name"). The defendant's filing of a 19 U.S.C. §1592(c)(4) "prior disclosure" with CBP does not constitute an "admission" or a finding of a §1592(a) violation by the defendant; by law, a prior disclosure only discloses "the circumstances of a violation of [§1592] subsection (a)." Indeed, it is remarkable that no party here has asserted that this prior disclosure was ever referred for investigation, or that CBP ever attempted to determine the

identities of the parties who had created and provided the apparently false invoices, in contravention of its "formal" duty of investigating based on "the date on which facts and circumstances were discovered or information was received that caused the Customs Service to believe that a possibility of a violation existed", 19 C.F.R. §162.74(g), once the defendant had alerted CBP to its problem of defalcation.

### B.   Revocation of SoL Waiver

Statute of limitation waivers in proceedings with the government are voluntary, unilateral, and non-contractual. <u>Stange v. United States</u>, 282 U.S. 270, 276 (1931). The Federal Circuit adopted this standard in <u>United States v. Ford Motor Co.</u>, 497 F.3d 1331, 1336 (2007) (quoting the Supreme Court's standard with specific respect to the 19 U.S.C. §1621 SoL for §1592 violations).

With regard to the effect of defendant's last SoL waiver, CBP asserts that the presence of the word "might" in it deprives Katana of any reliance interest. <u>See</u> <u>supra</u>. But, the defendant explains that its execution of the waiver was prompted by more than the language of the waiver form itself: at an in-person meeting between Katana's counsel and officers and the Assistant Port Director of Customs at Long Beach, California, held on March 21, 2016, Assistant Port Director Garcia expressly represented to

Katana that it would be provided an administrative notice claiming and explaining Katana's "violation" of withheld duties and granting the company an opportunity to respond.  Katana's counsel confirmed this representation in writing.  See Def's Br., Ex. H.  This representation was operative and uncontradicted when, seven months later, CBP requested a third SoL waiver, to allow for the orderly conclusion of administrative proceedings.  See id., Ex. L.

        The central question of whether the complaint was timely filed obviously involves resolving the propriety of defendant's revocation of its last SoL, when it became clear that the further administrative procedures it had been "promised" would not be forthcoming.  Defendant's position that it was entitled to further "administrative procedure" is somewhat at odds with generalized decisions on what administrative procedure is "required" when only unpaid duties are claimed.  See, e.g., United States v. Aegis Security Insurance Co., 43 CIT ___, 422 F.Supp.3d 1328 (2019). Unpaid duties would seem to be an obvious violation of subsection (a), and "the United States may also seek the unpaid duties "from those parties traditionally liable for such duties, e.g., the importer of record and its surety" in addition to the person who actually violated subsection (a).  United States v. Blum, 858 F.2d 1566, 1570 (Fed.Cir. 1988).

From a purely technical perspective, plaintiff's filing of this action, after affording the defendant "notice" of its duty demand, is not inconsistent with generalized case law on notice and opportunity to be heard (i.e., here).  Any action to recover unpaid duties, whether administratively or judicially, is, of course, a "further proceeding" within the meaning of section §1592(b)(1). And as a least fundamental matter of due process, the defendant was entitled to, and did, receive[23] in the monetary demand from CBP a "specific" explanation that duties had been underpaid on entries of PVLT, which, obviously, constituted a "violation" of subsection (a), apart from the fact that the defendant was named as the "importer of record" on the entries and the fact that it had "admitted" to about $5.3 million as being "owed to" the Treasury.

However, the plaintiff filed this action without undertaking the type of administrative procedure it had "promised" the defendant.  And its note does not state that the defendant "admitted" that it owed that amount to CBP.  Given all that is now before the court, the monetary demand was short on such facts.  The

---

[23]   Cf. 19 U.S.C. §1592(b)(1) ("[i]f the Customs Service has reasonable cause to believe that there has been a violation of subsection (a) and determines that further proceedings are warranted, it shall issue to the person concerned a written notice" et cetera).

defendant has steadfastly and repeatedly informed CBP that it did not authorize the use of its name as the IOR on the entry forms. Furthermore, it undertook its own investigation to _aid_ CBP to discover the truth of the matter.  Absent a specific accusation in the notice to the defendant that explains _exactly_ _how_, under such circumstances, CBP believed the defendant to be "responsible" for the unpaid duties, the duty demand notice to the defendant can hardly be said to fulfill the requirements of §1592(b)(1).

Plaintiff's complaint suffers a similar shortcoming.  It barely mentions that the defendant, "as the importer of record, caused" the under-calculated duties and fees.  Compl. ¶13.  But again, the plaintiff knew, and apparently agreed beforehand, that the defendant had been defalcated.  _See_ _supra_.  The complaint's reliance on that duty demand thus fails to "state[ ] a claim to relief that is plausible on its face" (_Iqbal_, 556 U.S. at 678, quoting _Twombly_, 550 U.S. at 570), given the facts as presented now herein.

The record herein supports the conclusion that the defendant does not bear responsibility for the unpaid duties that the plaintiff seeks.  The defendant was certainly aware of the breadth of the problem in which it was enmeshed.  And generalized

case law indicates that collection of unpaid duties does not
"require" the "elaborate" administrative procedures of §1592(b)(1),
once CBP reasonably concludes that a defendant bears responsibility
for making the Treasury whole for unpaid duties as a result of a
subsection (a) violation.  Nonetheless, the law does not excuse CBP
from failing to provide the precise reasons for holding a defendant
"responsible" for paying its §1592(d) duty demand in its complaint,
which has not been articulated in the one at bar beyond alleging
that the defendant was the "importer of record," and omitting any
indication of the fact that defendant was defalcated.  See supra.
Merely stating that the defendant was the "importer of record" does
not suffice in the circumstances of this action.

     Therefore, given all that had transpired since the
initiation of the audit(s) and beyond, the court cannot conclude
that defendant's prior revocation of its last SoL was without legal
effect, once it became apparent that CBP was simply going to bring
it to court on an inarticulate charge.  CBP's first audit report
acknowledges defendant's position that "[u]nbeknownst to Katana, it
appears that the Chinese suppliers, working with Customs brokers in
Los Angeles, made Katana the importer of record."  Letter of June
26, 2019, at Exhibit D, page 4.  The audit nonetheless continued to
assume Katana "knew" that it was the importer of record.  See id.

at 5 ("Katana, as the IOR, is responsible for the correctness of the entry documentation presented to CBP and all applicable duties, taxes, and fees").  But prior to Ms. Hiyama's receipt of the Katana file, CBP's Assistant Port Director had already, and therefore apparently, acknowledged Katana's DDP agreement with its sellers. Correctly construed, that agreement absolved it of the problems caused by those who actually inflicted injury on the Treasury through misuse of defendant's name.

V

This being the case, and considering CBP's apparent recalcitrance in specifying to the defendant the actual §1592(a) violation it committed, the defendant has provided reasonable justification for its revocation of its last SoL, with the result that this action is now barred by the passage of time.

Plaintiff's cross-motion for summary judgment must therefore be denied, with judgment of dismissal entered on behalf of the defendant.

So ordered.

Decided: New York, New York
         March 28, 2022

                                    /s/   Thomas J. Aquilino, Jr.
                                          Senior Judge